I'm sorry? I'm asking permission. Oh, sure. Absolutely. Everybody should get comfortable and settled and bring their water or take their water or whatever. Thank you. Good morning, Your Honor. Good morning. I'm James Leggett, and I represent the appellants in this case. There are a number of issues, but if I don't mention specifically, please don't take that as a waiver. We understand. I think it's important to set the stage in this case. And this case involves an airplane crash where a Piper Cub was piloted by Roger Shuffles from his own farm's airfield. Mike Palmquist was in the back seat, one of his employees. They'd just completed checking for crop damage by grasshoppers, and they were headed back to Wilbur Airport. This is in eastern Washington. It's a relatively flat area, gently rolling wheat fields. And the issues don't arise until we get to the point where Michael Palmquist lost his memory. And at that point, they were just below 1,000 feet, headed southbound toward the Wilbur Airport. If you look at some of the exhibits, either AER 335, 339, or the combination 349, you can get an idea that the Shuffles' airfield is relatively north-northwest of the Wilbur Airport. Wings level, Piper's going back to Wilbur Airport. The next thing that we know is that the Piper aircraft has impacted the ground on a different heading, 60 degrees nose low. There's no dispute in this matter that there was no mechanical problem with the airplane. There was no medical problem with the pilot. It was not known what happened. There was a theory that he'd hit a wingtip on a low rise. But the wingtips, they're in the exhibits. There are pictures of them. They're undamaged. Mr. Wiberney, which was a neighbor farmer where it landed on his land, went out with the NTSB investigator and found that there was no strike. Let me ask you a question about the hypnotically refreshed recollection of the survivor. Am I correct in understanding Washington's state law to prohibit the use of testimony that has been hypnotically refreshed? That's correct. Washington's state law is similar to the Arkansas law in the Rock case. So why isn't that the end of the inquiry on whether he can testify? Well, first of all, this is not a state law case.  Yes, but don't we apply the State's rules of witness competency in the place where the case is tried? This is not a competency issue. As the Supreme Court said in Rock, it would be unconstitutional for a State to bar, to have a blanket bar for this type of testimony. And the point is, in this case, is I think the trial was a criminal case, was it not? That's true. And this Court, the Ninth Circuit through Mancuso and its progeny, have applied, as does the Supreme Court, applied the same thing to civil arena, especially when it deals with one of the individuals that are a party. In this case, Michael Palmquist is a party. And one of the – I think that the distinction, pardon me, that the trial judge tried to do is adopt the Fifth Circuit rule in Marst, which did something very different than this Court does. First of all, it put the burden on the witness or on the party offering the testimony to prove that it was consistent with the other evidence and there was no problem with the refreshment. The second thing is it required corroborating testimony or corroborating evidence. In this case and in the Ninth Circuit, that has never been the position of the Court. The burden is on the attacking party. In this specific case, Dr. Knight, who performed the hypnosis and the refreshment, his sessions were videotaped. There's no challenge to it. Are you telling us that the case of finding complete refusal of hypnotically refreshed recollection as being violative of a criminal defendant's rights to due process are applicable in civil litigation? The admissibility of hypnotically refreshed recollection under the Ninth Circuit rule applies the same to civil litigation as it does to criminal litigation. The Supreme Court case of Rock applied to the constitutional right of the defendant to present a defense in a criminal case.  Right. So that the – I guess what I'm getting at is this. Are you telling us that the Washington State statute is unconstitutional if applied in a civil case? It's not a State statute. It's a rule of law. A rule of law? The Court has created it. Right. Right. They differ from the Ninth Circuit and from Rock. Right, because the Ninth Circuit allows it under certain circumstances and within the discretion of the trial judge, depending on a foundational finding. All right. But – and Washington State bars it altogether. But what you're telling me is if we were to apply the Washington decisional law barring it altogether, then based on the criminal cases that were decided regarding ability to present a defense, that application would be unconstitutional, violating the Fourteenth Amendment somehow? What I'm trying to – now, first of all, I don't believe that's an issue in this case. I don't believe there's an issue that the Washington evidentiary rules apply in the Federal court in Washington. Pardon me. Suppose they do. Okay. If you suppose they do, the – this Court has found that in the Ninth Circuit court of appeals under Mancuso, that credibility or foundation is not subject to challenge. It's subject to cross-examination so long as the hypnosis process is not subject to defect. Counsel, would you answer this question for me? Sure. Perhaps I can get back to what I'm asking. I'll try. Suppose we decide that under Section 601 of the rules of evidence, Washington law does apply, and hypnotically refreshed memory is not admissible in this case. Right? Okay. Is it your contention that that's a violation of due process, yes or no? I don't believe that it would be a violation of due process. All right. Let's get on to whether the Court would be correct in rejecting this hypnotically refreshed recollection because of insufficient foundation. How did the trial court abuse its discretion if it did exercise its discretion in rejecting this testimony? Okay. First, there was no challenge to the propriety of the examination. There was no new evidence on the validity of hypnosis refreshed recollections. Their only expert was the same expert that provided testimony and the same testimony in the Rock case, Dr. Loftus. There wasn't anything new. The Court specifically found that it wasn't making its finding based upon any defect in the process. It just found that there was too great a risk of what he referred to as confabulation, which is lying or misrepresenting by a witness. This Court has consistently said that cross-examination discovery solved that. It doesn't matter whether the witness recalls something because of the lapse of time or something to trigger the memory or whatever. That's subject to cross-examination. Isn't the judge's gatekeeper process as to whether this was too suggestible just exactly the same thing we do all the time in determining whether a show-up lineup is too suggestible? I think what he did is, if it were a trial, if he had done after the trial and he'd seen the witnesses and said, okay, I choose not to believe Michael Palmquist, then he'd be within the scope of his discretion as a finder of fact because it's a Federal tort claim, so it's tried to the Court. However, at a summary judgment basis, the question of credibility of a witness and this judge specifically found, he was very brave and straightforward about it, he said, I don't find him credible. I don't find the expert credible. No. He did not say I don't find the expert credible. He made no challenge to the expert. No, no. You're quite right. He said, I don't find Palmquist credible when refreshed by this expert, by this process. Or by the hypnosis. Right. Correct. What's wrong with that? Can't he make the foundational finding, which qualifies the testimony to be relevant, that the setting in which the recollection was refreshed was so fraught with suggestibility? Oh, I think he could make a finding that said the hypnosis process was defective and was improper, and therefore I'm barring the testimony. But he did not do that. He did not find that there was anything wrong with it. He not only had the transcript, or we typed up a transcript, he had a videotape to watch it. It's in the record here. Albeit, it's difficult to hear. It took a lot of work to put together the transcript. But it was nobody was hiding anything. Everybody knew from square one. Now, the question I want to pry to is also corroboration. Now, the defense of the United States was that this C-17 aircraft, which is a very large airplane, was nowhere around it. In this presentation, maybe you could address something for me, moving beyond the – let's just assume for a moment that the hypnotically induced testimony was properly excluded as incompetent under Washington law. The district court nonetheless granted summary judgment, okay? Now, put aside the hypnotic testimony and just look what's in the record. Is there still enough evidence there to get around summary judgment? I believe there is, and we addressed it in our brief, and I can – I was just going to talk about it. Right. Now, if that's where you're going, but I want to make sure you do, because let me – let me – you know, you can – a summary judgment can be granted on several grounds. One, the district court can say there is absolutely no material disputed fact in issue here. And I don't think the district court said that because you have the declarations and the depositions of the two witnesses. You can grant summary judgment on the basis that, okay, there is a disputed fact here, but it's so minor, you know, no reasonable trier of fact would ever decide that fact as the producing party is advocating. Sure. And the rule refers to that as a material fact. Right. But in this situation, okay, what you have is, one, we were barred from evidence. There was an order that precluded us to obtain evidence. The Air Force denied that their airplane was ever there. Right. They were never able to depose a crew, do anything. The issue that the discovery was supposed to flesh out on proximate cause was for us to provide evidence that there was a C-17 there. We did that. We found two evidence, two witnesses. Mr. Diberg, who was a farmer south of Wilbur, who saw the airplane come northbound and turn to the west, west of Wilbur, or north of Wilbur, and Mr. Lofquan, who was a farmer and was a bus driver at the time of his deposition, who was in his house. He'd gone out to his garden. He looked and went right over his house from east to west, north of Wilbur. And if you take and you look at his exhibit, and we put it together on an overlay, but this is AER-349 for the court's reference. Draeger's is AER-339. It was an attachment to his declaration. And Lofquan's is AER-335, which is an attachment to his declaration. The blue is Mr. Draeger's drawing. It shows who was down here. He was down here. The orange is Mr. Lofquan's drawing. And if you look at the consistency, here's DD is the point in his deposition that Mr. Draeger said that's where it was. You draw a line directly, and this plane is wings level, headed this direction, and the crash is over here. It was in a straight line. It was one minute from the accident site. The time was consistent. The location was consistent. There was no other explanation for the crash. The experts we had went through and talked about all the possible causes that there is no other cause. There was an issue of fact for a jury. And we could have had an advisory jury because Boeing is a party. But that was — But just in the Supreme Court's language, it just wasn't a Mearson's filament of evidence. Right. More than that. Is that your position? That's right. And I think — Whatever. I never really understood what a Mearson filament meant. I think, quite frankly, what it is, because could a reasonable man or woman, listening and looking at it, have a question in their mind, a legitimate question as to who was right? So it should be — all the evidence should be heard. The witnesses should be heard. The discovery should be allowed. One of the real issues here, there's no question, nobody says that these airplanes came to physical contact. If you look at AER-247, it's a scaled picture of the two aircraft, the difference in size. It's not going to get there. The wake, we couldn't obtain the evidence of the size and dimension and time duration of the wake from a C-17 aircraft. That was barred to us by the judge's order, from which we appealed. Counsel, your time has expired. And we'll restore a little bit of it on rebuttal. Okay. Thank you. Thank you. We'll hear from Mr. Faitian, I think. You might do well to follow up on what Judge Pires was just asking your learned colleague here. Forgetting about the hypnotically-induced recollection, wasn't there a trial issue established by Witnesses Draeger and, was it Lafbon or Laubon? Lafbon, sir. Who saw, both of whom say they saw a C-17 in the area, right? Well, there are several misstatements in what my esteemed counsel just related to the court. One was the use of the demonstrative exhibit, which was found to be misleading  But what you have, if you We have de novo review, though, right? Pardon, ma'am? We have de novo review of the question whether summary judgment was proper. Yes, ma'am. Yes, ma'am. If the question is what we are left with without the post-hypnotic testimony, it's simple. There is the testimony of two lifelong friends of the decedent. Neither of those Witnesses saw a collision. Neither of those Witnesses saw an encounter. Neither of those Witnesses saw a what? An encounter between the C-17 and the Piper aircraft. But this is, again, a wonderful jury argument. And I guess circumstantial evidence is still evidence. Yes, ma'am. If a car is involved in an accident at a crossroads and people are half a block away and they see the car is going towards there, that's admissible evidence. It allows an inference that the car reached that intersection. Yes, ma'am. And also the absence of other reasons is in the record. Yes, ma'am. But there still must be, under Washington State law of negligence, they still must establish specific facts for each element of the claim of negligence against the United States. The first of those is the existence of a duty. There's no allegation. Let's assume the C-17 flew by. It didn't happen. But let's assume one did. There was no violation of any regulation in doing so. It could have been flying under visual flight rules right over that ranch at the altitudes alleged. But that wasn't the basis of the summary judgment. The summary judgment was entered on the basis of no proximate cause. Please direct your remarks to that issue. Yes, sir. Why do you say that there's no circumstantial evidence that the path of the C-17 was in whole or in part a substantial factor in causing the accident? May I refer to the exhibit that was a demonstrated exhibit that we used in the trial court below? Your Honor, this the underlying exhibits from which this was derived were admitted into evidence below. And what it depicts is – Where's north? North is to the top, sir. The allegation – well, first of all, the accident site, the NTSB fixed the location of the accident site north of Albertson Road. Mr. Drager was south of town. He's witness number one. He came forward within weeks after the accident and said, I saw what I believe to be a C-17 testifying. So he was standing right here – or, I'm sorry, he was standing right here south of Wilbur, and he saw it here, and he saw it go this – in this direction. And he didn't look at it the whole time. He saw it here, and then he saw it here. And that was his last point of observation. We know that because he used the water tower in Wilbur as a sighting reference and said he didn't see it after that point. That's still three to four miles from the accident site. The second – and Mr. Drager also admitted under cross-examination that the C-17 that he alleged – allegedly saw could have been as far north as here or as far north as here. He didn't know. He wasn't certain of the distance, nor was he certain of the heading, except that it was headed generally northwest. The second witness was Mr. Latipo. He lives over here. He saw – or, as a matter of fact, right at the edge of the drawings. He's – unlike the demonstrative exhibit shown by counsel, his observation ended right here, which is more than four miles from the accident site. Nobody saw – no witness saw what that purported C-17 did after those two points. And what was the heading that Mr. Latipo saw? He said due east. Now – Due east or due west? I'm sorry, due west. Oh. You are going to confuse me. So what we have – What we have is if those trajectories stayed the same, we have his exhibit. I mean, it looks to me like you just proved the plaintiff's case for him. I just don't understand why there isn't a reasonable inference to be drawn that the – that the sighted aircraft continued on that path, because how fast does it go? How long does it take it to get three miles? It's – Well, Your Honor, it's traveling at – it would have been traveling at about 200 – I'm sorry, about 250 knots, which is about 275 miles per hour. Okay. So how long does it take it to get – That's about four miles a minute. It would have been there in about a minute. But there – the testimony is – first of all, the testimony is inconsistent between Mr. Drager and Mr. Latipo. It's inconsistent in a number of respects. He says, Drager, 700 to 900 feet. I'm sure of that altitude. Latipo says it has four propellers on it, and it's at 200 to 300 feet headed due west. This ground track is not this ground track. This altitude is not this altitude. They both can't be right. But even if we take all inferences in favor of plaintiffs, as we must for summary judgment, it could argue – we could argue that it is evidence of a C-17 at some undetermined altitude headed that way. But here's where the problem is. The C-17 can turn – it takes a big area to turn in, but its turn radius is undisputed 3,200 feet, about half a mile. These are mile squares. The C-17 could have turned anywhere after this point, and those are these curved arrows that are trying to indicate that to the district court. Nobody knows – Which was the path of the plane that crashed? Where was that on here? The – that aircraft was doing a number of turning maneuvers, overflying crop areas, overflying the crops, and then turned, according to the testimony, pre-hypnosis testimony, he was headed to the southeast toward Wilbur Airport. So – but we don't know the altitude of that aircraft. Mr. – But probably fairly low, since they were dealing with crop questions. So they're not going to be at 10,000 feet at that point, that close to the airport. All it shows, Your Honor, the two witnesses, all they show is that they say a C-17 was headed in that direction at some indeterminate altitude between 200 feet and 900 feet. We don't know what the altitude of the Piper aircraft was. We don't know its precise heading. We don't know what the C-17 did after that point. It could have turned around. It's like saying I saw a truck go down a street, and four miles later there's an accident. It must have been the truck. No. One minute later, which is probably a block. I mean, part of – you know, four miles or three miles sounds big, but when you're dealing with an aircraft going as fast as they go, it's very rapid. It's – It is very rapid. Very close in time. I understand that, Your Honor. But still, it requires a leap of speculation to show that a C-17 was there. And that's impromptu. People said they saw it. I don't understand why that's a leap of speculation. Your Honor, they saw it over here. They say they saw it over here or here. They didn't say they saw it over here. They said they saw it heading in that direction. Yes, sir. They said that. There are inconsistencies. And, of course, you say they made it up completely. It wasn't there. But that seems like totally a jury question. Your Honor, the reason why it's not, as far as the issue of proximate cause, the first thing you have to do is establish that a C-17 was there. Now, for the other elements of negligence, first of all, it takes a leap of speculation from – to say that because it was here, that this aircraft wouldn't have turned and it wouldn't have gone straight over there. It could have gone anywhere. It could have climbed. It could have went back to McCourt Air Force Base. It could have gone anywhere. We don't know. We would have to speculate that this was involved in the accident with this aircraft. And there's no record – there's no evidence in the wreckage that indicates a C-17 or any other airplane was there. This pilot dragged – So basically what you're saying is that the district court just didn't believe these two witnesses. I don't think – that may be true, but that's not what the ruling was based on. And what was it based on? Well, it was based on summary judgment was granted in the absence of this post-hypnotic testimony on the basis they haven't established that approximate cause, that the C-17 was there. But I would also argue that the next element really – So we're reviewing de novo, and let's say that we agreed that the post-hypnotic evidence was still – was properly excluded and had competency under Washington law. So then the question is, is there still a genuine triable issue of fact? No, Your Honor. Why not? I mean, so you'd say, well, just look at these declarations of these two fellows. That's not good enough. That's just – at best, that's just a tiny scintilla of evidence that no triable issue – no trier of fact is ever going to be persuaded by that. It's a matter of law. Your government's entitled to judge it. First of all, this Court, of course, can – can affirm summary judgment on any basis it finds in the record. Now, the district court found no approximate cause as the – as a preliminary threshold issue. There wasn't enough evidence in the absence of speculation that a C-17 was involved in the accident sequence. But there are other bases that the Court could have ruled on. For instance, there's no evidence of a duty owed by this – by the purported crew of the C-17 to the piper. Was that one of the bases – I was looking for this. I don't seem to have it in front of me. Was that one of the bases you argued to the district court in support of your summary judgment motion? Yes, ma'am. Yes, ma'am. That there is no duty, that there is no – there is no evidence of a duty or a breach of duty or approximate cause. The only thing you get, even if the hypnotic testimony was admitted, is that you get a fellow who says he saw a C-17 right in front of him. That still doesn't establish a duty or a breach of duty on the part of the C-17 pilot because you don't know the angles. You don't know the altitudes. There's no radar ground track. There's no record evidence whatsoever. It's just the visions of a man who's been subjected to hypnosis at four times. Let me ask you. Was all the discovery completed on that issue? On which issue? Duty, whatever could have possibly been. Your Honor, I could have deposed some of their experts, but – How about from their side? Oh, yes, Your Honor. We moved to bifurcate discovery because they wanted to go into the design of the C-17, and there's more than a million hard copy documents that would have to be produced. So we bifurcated discovery, and they sought to depose all members of this crew of the closest C-17, which is 40 miles away, the only one that physically could have been there. And we said – we objected because there's a war going on. And the C-17 is a strategic asset. We know where they are. It's like aircraft carriers. We know where they are. And these were used in the global war against – And, of course, the government never makes mistakes or never gives information that isn't absolutely true. I'm not saying – So you're not entitled to discovery or to cross-examine the crew? We offered the aircraft commander for deposition, and Mr. Leggett himself said, since discovery has been bifurcated and we're limited solely to proximate cause, I don't need – this is him talking – I don't need to depose any other crew members. We also offered to provide statements from crew members. We could obtain them from whatever theater of the war that they were in to support the aircraft commander who said we weren't there. May I ask you a question? Yes, sir. Is it your position that there was no evidence submitted to the district court as to any violation by the C-17, supposing it was there, of any air safety rules or any rules of the road such as they might exist in the air? Your Honor, there are – Is there some rule of the road that big planes have to give right-of-way to small planes like ships have to give way to rowboats? Your Honor, there was no evidence of any statutory violation of the aircraft, of the purported C-17, by virtue of it being there. They argue that for some reason that their aircraft would have been favored no matter what. It's absurd. If you look at the Federal Aviation Regulations, 14 CFR 91.113, and its counterpart in the Air Force, Air Force Instruction 11-202, paragraph 5.5, clearly shows that the least maneuverable aircraft has the right-of-way. That's why hot-air balloons don't move out of the way of gliders. That's why gliders don't move out of the way of a fighter aircraft. And when you've got something that weighs 600,000 pounds, a wingspan of 170 feet, it does not get out of the way – it cannot physically get out of the way of a Piper aircraft. I might add also – Although you were just telling us how quickly it can turn. Ma'am, its turn radius is 3,200 feet. Piper's is under 200. So even if it was there, even if Palmquist's testimony is accepted as admissible after hypnosis, he sees a C-17 flash past basically right in front of him, across left to right. That doesn't mean there's no evidence of a breach of a duty to see and avoid on the part of the C-17. First you have to see it. Where is the evidence that the C-17 should have been able to see him? Because prior to that instant, we don't know where it was, if it was there at all, which it wasn't. It could have been banked away. It could have been banked towards it. There's no evidence of visibility. There's no ground track. There's no radar information. Nothing shows that there is a breach of a duty to see this Piper. More importantly, even if there was, there wasn't anything that a crew of such a massive aircraft could have done, it still takes 7.5 degrees a second, ma'am, is how fast a C-17 can turn after it rolls into bank. 7.5 degrees a second. It would take 10 to 15 seconds to turn 90 degrees. And then you've still got the trailing weight behind it that extends for miles. You know, and so suddenly, you know, the argument that they made is not supported in law, and it's not supported by the facts. There is no evidence of a duty owed by the C-17, none whatsoever, to this pilot. There is no evidence of a breach of that duty to either see or avoid that aircraft. Thank you, counsel. You've exceeded your time, and I think we understand your position. Yes, ma'am. And I meant to ask that five minutes be reserved for Boeing to respond. You didn't, and you're well past your time. I'm sorry. We used all of your time, but we'll give you about to actually, why don't we give you a minute, and we'll give you a minute. Everybody's got a minute. Thank you, Your Honor. Mr. Schultz, I believe it is. Yes, may it please the Court, Max Schultz on behalf of the Boeing Company, and I will keep my remarks brief. First, Mr. Leggett, I believe, during his previous remarks to this Court, indicated that his expert witnesses had excluded all causes of the crash other than wake turbulence. If you look at the declarations, and specifically look at them after the portions that were excluded as reliant on the post-hypnosis testimony, at best the remaining declarations exclude a mechanical malfunction, and taking them in the light most favorable to the plaintiffs exclude the possibility that the pilot caught a wing tip. There are many other possible explanations for a plane crash that could have occurred, and based on the evidence that was in the record, it would be speculation to assume that the only other thing it could have been is a wake turbulence encounter with a C-17 aircraft. And I wanted to direct the Court's attention to that. The declarations, Mr. Wood's declaration is at AER 200. The second declaration of Mr. Wood was struck in its entirety by the Court as entirely being based on the hypnosis testimony. Mr. Wells' declaration was at AER 240, and Mr. Kennedy's declaration was at AER 304, and all substantive information from that declaration was also struck as reliant on the testimony. So that is one of many levels of speculation that the Court would have to, that the trier of fact would have to engage in to determine that a C-17 was an encounter with a C-17 and specifically its wake turbulence was a proximate cause of the crash of the Piper Cub. Furthermore, with respect to the testimony of Mr. Lofman and Mr. Drager that's already been discussed at length as far as the inconsistencies We have used your time and we've heard some conversation about that point as well. Thank you very much. Thank you. I would appreciate your addressing the question since we have de novo review, whether the judgment below should be affirmed on the ground that there was no duty owed in the circumstances. I would refer the Court, I pulled it out to page AER 204, which is the excerpts of the Federal Aviation Regulations that apply. What's the excerpt of the record? The Federal Aviation Regulations that apply to VFR aircraft. They have 204. And your citation again was ER? AER 204. All right. That's part of Mr. Wood's, Dr. Colonel Wood's declaration that was not stricken. They have the standard right-of-way rules of any other vehicle. And in this situation you have a southbound Piper aircraft and a westbound C-17 aircraft, which makes the Piper aircraft the favored driver. So there's a requirement for yield. The other thing, the other issue, if you look at AER 246, it shows off a website of Travis Air Force Base. It shows the vortex goes back at least five miles, spreads out, and sinks below the aircraft, a C-17, just by going by. So the rules say — Could you kindly go over that slowly again? Sure. AER 206, what do you want us to find? 246, it's a graphic that shows the wake turbulence profile, according to the Air Force, at Travis Air Force Base, where they have C-17s. But the duty is based on the Federal Aviation Regulations and an overtaking and converging aircraft. The Piper was the favored aircraft. They also had TCAS, which they had capability. The Piper had an IFF-SIF, so if they had it turned on or had it in the airplane, they would have an audio warning and a visual warning that there was an airplane out there. And according to the testimony of the aircrew, even though they say they weren't there and we don't know where the Air Force has their C-17s, that they supposedly know where they are all the time, they said that they had three pilots on the deck, flight deck. I had understood you to say that the wake turbulence evidence shows that there is wake turbulence at five miles from the airplane. That's correct. In which direction is that? Behind it. Behind it. That's correct. So when it goes across a section of land, and this is a problem with flying that low with the C-17 aircraft, and they have warnings that they give out when they're fragged into these VFR routes. This airplane was not fragged into a VFR route. He was not there by direction of his command. Thank you, counsel. The case just argued is submitted. We appreciate the arguments of all parties. And that ends.
judges: Graber, Paez, Bea